**In re McLEAN INDUSTRIES, INC., United States Lines, Inc., United States Lines (S.A.), Inc., First Colony Farms, Inc., Debtors.**

**Bankruptcy No. 86 B 12238–41.**

United States Bankruptcy Court, S.D. New York.

March 3, 1987.

See also, Bkrtcy., 68 B.R. 690.

Kronish, Lieb, Weiner & Hellman by Richard Lieb, Preston T. Towber, New York City, for movants.

Milbank, Tweed, Hadley & McCloy by Alan W. Kornberg, John G. Gellene, New York City, for debtors.

White & Case by Allan L. Gropper, James P. Laughlin, New York City, for Official Creditors Committee.

Rosenman & Colin by Paul L. Bindler, New York City, for IBJ Schroder Bank & Trust Co., Indenture Trustee.

Harold Jones by John Campo, New York City, Trustee.

## DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

American Capital Asset Management, CNA Financial Corporation, Elliott Associates, L.P., United Savings Association of Texas and Westinghouse Credit Corporation ("Movants") seek an order, pursuant to § 1102(a)(2) of the Bankruptcy Code, 11 U.S.C. § 1102(a)(2) (1986) (the "Bankruptcy Code"), requiring the United States Trustee for this district to appoint an additional committee of holders of 12% subordinated debentures due in 2003 and of 14¼% subordinated notes due in 1994, both of which were issued by McLean Industries, Inc. (jointly the "Debentures").

The motion is opposed by the Official Committee of Unsecured Creditors (the "Committee"), the Debtors and the United States Trustee ("U.S. Trustee"). They principally assert that the motion should be denied because of the Movants' alleged failure to exhaust administrative remedies and that the decision of the U.S. Trustee to appoint only one committee in this case is reviewable only under an abuse of discretion standard. The Committee and the Debtors further assert that the appointment of a debentureholders committee is not necessary to achieve adequate representation of the debentureholders in these cases since the nineteen member Committee currently includes one debentureholder, an indenture trustee and a vacancy that the Committee has requested the U.S. Trustee to fill with an additional debentureholder.

### I.

These four jointly administered but not consolidated cases were filed on November 24, 1986. Together they concern assets and liabilities each with a book value in excess of two billion dollars. McLean Industries, Inc. is a holding company having six direct subsidiaries. Two of those subsi-

diaries, First Colony Farms, Inc. ("First Colony") and United States Lines (S.A.), Inc. ("U.S. Lines S.A."), also filed reorganization petitions. First Colony, in addition to conducting its own business, is the sole shareholder of United States Lines, Inc. ("U.S. Lines"), also a debtor herein.

The assets and debt structure of these four companies are varied and complex. For purposes of this motion, it can be merely noted that the exhibits attached to the various petitions report that McLean has assets of $552,809,000 and debt principally consisting of the Debentures in the outstanding amount of $262,572,000. Additional non-contingent and liquidated unsecured debt of $16,194,000 is also stated. The Debentures are held by approximately 1,229 entities. IBJ Schroder Bank & Trust Company ("Schroder") serves as indenture trustee. U.S. Lines S.A. reports secured debt of $73,650,000, general unsecured debt of $383,378,000 and assets amounting to $132,014,000. First Colony reports assets of $205,835,220, secured debt of $14,234,481 and general unsecured debt of $12,062,021. U.S. Lines reports assets of $1.26 billion, secured debt of $660,061,262 and general unsecured debt of $1.309 billion.[1]

An organizational meeting of creditors was held on December 11, 1986. Counsel for certain debentureholders, including one of the Movants seeking the formation of an additional committee, delivered a four page letter to the U.S. Trustee for this district on December 10, 1986. In the letter, it was requested that the U.S. Trustee, were he inclined to form only one committee for the McLean case, appoint a sufficient number of debentureholders so that they would constitute a majority. Alternatively, it was requested that a separate debentureholders committee be formed.

In support of these requests, Counsel noted that the Debentures constitute nearly all of the McLean debt, and asserted that the rights of debentureholders conflict with those of the secured creditors and trade creditors of McLean's direct and indirect subsidiaries. He further observed that "the realization of value on McLean's own assets may depend, among other things, upon its receipt of distributions from its debtor subsidiaries after satisfaction of the massive claims against the subsidiaries." For those reasons, he argued that protection of the public, in view of the 1200 debentureholders and the other points advanced, calls for the establishment of a McLean statutory committee or a separate debentureholders committee. No direct response was made to this letter. The U.S. Trustee, on December 11, 1986, appointed a single committee for these jointly administered cases.

That committee consisted of the following membership:

*Prudential Insurance Company of America* —creditor of all four debtors with diverse claims including (i) a claim against McLean on a guarantee of certain subsidiary debt in excess of $90 million, (ii) a claim against First Colony for mortgage debt, guarantee debt and a lien on First Colony stock, (iii) a claim against U.S. Lines on substantially undersecured debt, (iv) a claim against U.S. Lines S.A. for cash, container and vessel collateral, and (v) a claim for approximately $7 million principal amount of the Debentures;

*NYSA–ILA Pension Trust Fund* —creditor of U.S. Lines and U.S. Lines S.A. on behalf of longshoremen who supplied services to those entities;

*MEBA Pension Trusts* —as the pension plan for the Marine Engineers Benevolent Association, a creditor of U.S. Lines and U.S. Lines S.A.; also owner of two vessels chartered to U.S. Lines;

*Mitsubishi International Corporation* —vendor and lessor of certain equipment used or owned by U.S. Lines and U.S. Lines S.A.;

*Equitable Life Insurance Co., Interpool Ltd., Manufacturers Hanover Leasing*

---

**1.** These figures are taken from exhibit A to each of the petitions. Also attached to the petitions are affidavits required by Rule 52 of the Local Rules of this Court. Those affidavits contain figures differing in some respects from those reflected in the text. The differences are not material for purposes of addressing the instant motion.

*Corp.* and *Sea Containers America, Inc.*—creditors of U.S. Lines with respect to certain equipment leases;

*First Fidelity Bank, N.A., New Jersey* —creditor of U.S. Lines and holder of a security interest in certain charter receivables from the Military Sealift Command;

*General Electric Credit Corporation* —creditor of U.S. Lines and U.S. Lines S.A. and holder of junior security interests in certain of the vessels of U.S. Lines and U.S. Lines S.A. which are apparently substantially undersecured;

*Marine Terminals, Inc.*—trade creditor of U.S. Lines and U.S. Lines S.A.;

*Brady Marine Repairs Co.*—trade creditor of U.S. Lines;

*Daewoo Shipbuilding & Heavy Machinery Ltd.*—as builder of twelve vessels, a creditor of U.S. Lines and a holder of a second lien on the twelve vessels which is apparently substantially undersecured;

*Crowley Maritime-Delta Steamship Lines*—charterer of three vessels to, and creditor of, U.S. Lines S.A.;

*Short & Gass* and *Adler & Kops*—attorneys for individual personal injury claimants against U.S. Lines and U.S. Lines S.A.;

*IBJ Schroder Bank and Trust Company*—indenture trustee for the Debentures;

*Keystone Custodian Funds, Inc.* and *United Savings Associations of Texas* —holders of Debentures.

In summary, sixteen of the nineteen members of the Committee are creditors of U.S. Lines or U.S. Lines S.A., and one, Prudential, is also a creditor of First Colony. As to McLean, its debt was represented by two debentureholders having no other claims, Schroder as indenture trustee and Prudential, most of whose claims apparently lie against U.S. Lines S.A. and U.S. Lines but which also holds Debentures. Several of the U.S. Lines and U.S. Lines S.A. creditors hold security and may be undersecured; others are owners or charterers of U.S. Lines vessels.

Subsequent to the formation of the Committee, Keystone Custodian Funds and United Savings Association of Texas resigned, apparently citing the reasons set forth in the letter of December 10, 1986. We are told that the U.S. Trustee has appointed another debentureholder to fill one of those seats, and that the Committee has requested him to fill the other seat with a debentureholder.

In asserting that this Court should order the appointment of an additional committee to represent debentureholders, Movants principally assert a structural argument. They say that adequate representation requires, as a matter of law, appointment of a committee to represent public debt where jointly administered cases include a parent whose significant assets consist only of the stock of its subsidiaries and whose liabilities consist principally or almost exclusively of widespread publicly held debt. In support, they assert that the interests of such debt holders are in conflict with other members of the Committee who are creditors of the subsidiaries. The conflict is said to arise from the notion that payment to them, absent substantive consolidation, depends on satisfying creditors of those debtor subsidiaries having the real assets of the enterprise. Second, it is argued that an additional conflict arises from the parent having made potentially challengeable transfers to the subsidiaries in 1985. Third, they assert that the indenture trustee for the Debentures cannot represent them on the Committee.

In addition to these principal points, other contentions are contained in the Movants' papers. It is said that the case is shaky. The argument regarding the representative ability of the indenture trustee contains an assertion that the indenture trustee lacks representative power and is grounded on the notion of under-representation of debentureholders on the Committee. Accordingly, the Committee and the U.S. Trustee, in opposition, take the position that, if the motion raises issues other than the first issue, an evidentiary hearing is required.

The Committee, joined by the Debtors, also disputes the contention that an addi-

tional committee is required as a matter of law. The U.S. Trustee and the Committee further assert that the issue of whether an additional committee should be appointed must first be presented to the U.S. Trustee. They claim that the Court's role is to determine whether or not the U.S. Trustee's decision was an abuse of discretion. It is to these threshold issues that we first turn.

## II.

### A. Section 1102(a).

The appointment of an additional committee is governed by § 1102(a) of the Bankruptcy Code. That section was recently amended in connection with nationwide expansion of the U.S. trustee pilot program instituted in 1979. *See* 28 U.S.C. § 581 (1978); 11 U.S.C. § 15101 *et seq.* (1978) (repealed). In connection with that amendment, 11 U.S.C. § 151102, which governed the formation of additional committees in pilot districts, was repealed, Pub. L. No. 99–554 § 231 (1986), and re-enacted verbatim as 11 U.S.C. § 1102(a)(2).

As amended, § 1102(a) provides U.S. trustees with discretion to appoint additional committees for any appropriate reason, but the bankruptcy court may order a U.S. trustee to appoint one or more additional committees to assure adequate representation. It states:

(1) As soon as practicable after the order for relief under chapter 11 of this title, the United States Trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States Trustee deems appropriate.

(2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United

States Trustee shall appoint any such committee.

11 U.S.C. § 1102(a). Noteworthy is the absence of any indication from the statutory language that the Court's ability to determine the issue of adequate representation is fettered by any constraint other than the requirement that the appointment of one or more additional committees is necessary to achieve the designed goal. That absence is not surprising. The legislative history belies the U.S. Trustee's and the Committee's claim that Congress sought to limit the Court's role to a review of a determination by a U.S. trustee.

First, the legislative history makes plain that Congress viewed the pilot U.S. trustee program as a principal means of achieving the salutory goals of (i) ending appointment of trustees by the judges whom they would appear before and the appearance of favoritism created by that "awkward relationship", H.R.Rep. No. 764, 99th Cong., 2d Sess. 18 (1986), U.S.Code Cong. & Admin. News 1986, p. 5227, and (ii) separating "the administrative duties in bankruptcy from the judicial tasks, leaving the bankruptcy judges free to resolve disputes untainted by knowledge of administrative matters unnecessary and perhaps prejudicial to an impartial judicial determination." *Ibid.* The expansion to all but a few districts, *see* Pub. L. No. 99–554 §§ 111, 302 (1986), sought nationwide achievement of those goals. H.R. Rep. 99–764, 99th Cong., 2d Sess. at 18 (1986).

Accordingly, § 1102(a) was amended merely to place appointive power in the hands of the U.S. trustees as § 151102(b) had provided for in pilot districts. Consistent with lodging all appointive power with U.S. trustees, § 1102(c) was repealed. That section had provided the Court with authority to change committee membership.[2]

Second, that this change was all that was intended and that the Court is to determine

---

**2.** Thus, the court no longer has the option to change committee membership. *See In re Salant Corporation,* 53 B.R. 158 (Bankr.S.D.N.Y. 1985) 11 U.S.C. § 1102(c) (1978) (repealed). It

would appear that a U.S. trustee would have that power since he or she initially formed the committee.

*de novo* the issue of whether an additional committee should be appointed are confirmed by the legislative history to the amended § 1102(a). Consistent with leaving "bankruptcy judges free to resolve disputes," H.R. Rep. 99–764, 99th Cong., 2d Sess. at 18 (1986), U.S.Code Cong. & Admin.News 1986, p. 5230, the legislative history confirms that bankruptcy judges are to determine *de novo*, as they had previously, whether an additional committee is necessary to achieve adequate representation and thereby reflects the overall congressional distinction between administrative appointments and judicial functions. The House Report stated that the purpose of the amendment is "to transfer the authority to appoint the chapter 11 committee of unsecured creditors from the court to the U.S. Trustee as it is an administrative task. *The court still retains the authority to order the appointment of such administrative committees as are necessary*, but the U.S. Trustee has the authority to actually appoint these committees once the court has ordered." H.R.Rep. No. 764, 99th Cong., 2d Sess. 28 (1986), U.S.Code Cong. & Admin.News 1986, p. 5241 (emphasis added).

Further compelling this conclusion is the notion that Congress, although it addressed the duties of U.S. trustees, nowhere provided for a hearing procedure for the resolution of this or any other issue where individual cases could be addressed. Indeed, the list of U.S. trustee duties contained in 28 U.S.C. § 586(a) (1978), prior to being amended by § 113 of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554 (October 27, 1986), conferred on them the tasks of establishing and supervising a trustee panel for chapter 7 cases, serving as a case trustee when required by law to do so, depositing and investing money received, performing the duties prescribed for U.S. trustees by the Bankruptcy Code and making reports to the attorney general. The only function that bears on the subject of this motion is that of performing the tasks called for by the Bankruptcy Code. In no instance of which this Court is aware was there any notion that one seeking appointment of an additional committee in a pilot district under § 151102(b) must have first "exhausted administrative remedies" by applying to a U.S. trustee.

Had Congress contemplated such in amending § 1102(a), one would think that it, in contemporaneously amending 28 U.S.C. § 586(a), would have reflected such intention. All that Congress did in enacting that amendment, however, was to clarify what it meant by entrusting U.S. trustees with the duty of supervising case administration. In spelling out those duties, Congress spoke of U.S. trustees monitoring and commenting upon applications to engage professional persons, fee applications, plans under chapters 11, 12 and 13 of the Bankruptcy Code, disclosure statements filed under § 1125 of the Bankruptcy Code, taking action to ensure prompt and proper filing of all schedules and reports, and notifying United States attorneys of possible crimes. With respect to the issue here, Congress provided only that the discretionary supervisory duties of a U.S. trustee consist of "monitoring creditor's committees appointed under title 11." 28 U.S.C. § 586(a)(3)(E), as amended by Pub. L. No. 99–554, § 113 (October 27, 1986). Presumably, it is on the basis of such monitoring that U.S. trustees are to be able to determine whether there are any reasons for causing, as they may deem appropriate, the appointment of additional committees under § 1102(a)(1).

 It thus does not appear that Congress, in amending § 1102(a), had any intention of requiring a movant under § 1102(a)(2) to exhaust administrative remedies or to limit the bankruptcy court's consideration of the issues under § 1102(a)(2) to a review of the determination made by U.S. trustees. No procedure for such exhaustion was established; Congress sought primarily to take bankruptcy judges out of the appointment process and Congress expressly retained in the bankruptcy courts the ability to decide *de novo* the question of whether additional commit-

tees are necessary to assure adequate representation.

### B. *Exhaustion of Administrative Remedies*

Thus, it being plain that Congress left the bankruptcy courts with their initial power to determine the issue of adequate representation, it is also plain that the doctrine of exhaustion of administrative remedies does not apply. " 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." *United States v. Western Pac. R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956) (Harlan, J.). The issue presented here could also be considered by U.S. trustees as an appropriate reason under § 1102(a)(1). But, since it is not initially cognizable only by U.S. trustees, the exhaustion doctrine is inapplicable.

Further, the assertions principally raised by the motion were presented to the U.S. Trustee. While it is argued that the December 10, 1986 letter was inadequate in light of the extensive papers filed in support of the motion, review of the letter discloses that the principal arguments now advanced were disclosed to the U.S. Trustee. That is all that could be reasonably required. The U.S. Trustee's claim that a four page letter cannot be adequate merely because extensive papers were subsequently filed has no merit.[3] One would think that brevity should be encouraged. U.S. trustees, who surely formed the initial committees with knowledge of a debtor's debt structure and who have the ability to monitor creditors committees, should not require more to answer such requests. Indeed, the answer to the December 10, 1986 letter was given the next day when the U.S. Trustee formed one committee for these four bankruptcy cases. As the U.S. Trustee concedes, no further steps, such as an appeal within the Department of Justice, are available to Movants (Tr. at 49).

To be sure, Movants' motion papers implicitly raise points bearing on the issue of adequate representation. These include the economic circumstances of these Debtors and these cases and the notion that the debentureholders are not adequately represented by the Committee. They were not set forth in the December 10, 1986 letter. Still, as issues bearing on the ultimate issue of adequate representation, they are not initially cognizable solely by U.S. trustees. Exhaustion is thus not required.

Furthermore, even were resolution of the issues raised by the December 10, 1986 letter to be deferred to U.S. trustees, the Court could, at this stage where the U.S. Trustee has effectively ruled, review them *de novo*. Although the U.S. Trustee and Committee unaccountably fail to refer to § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706 (1982), in claiming that the scope of review is an abuse of discretion standard, both that statute and the case law concerning it apply to determinations within the Department of Justice of the nature called for in § 1102(a)(1). *Cf. Morris v. Gressette*, 432 U.S. 491, 500–01, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977); *Banzhaf v. Smith*, 737 F.2d 1167 (D.C. Cir.1984); *Proietti v. Levi*, 530 F.2d 836 (9th Cir.1976). The U.S. Trustee and Committee concede as much in asserting that the scope of judicial review is an abuse of discretion standard. *See* 5 U.S.C. § 706(2)(F). That standard, however, does not apply where the substantive legislation or its legislative history authorize a *de novo* court hearing, as do both § 1102(a) on

---

3. In also claiming that the December 10, 1986 letter was inadequate, the Committee mistakenly relies on *McGee v. United States*, 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971) (Br. at 17). In *McGee*, the Court was confronted with a "thoroughly going attempt to sidestep the administrative process", 402 U.S. at 487, 91 S.Ct. at 1570, pursuant to a "policy of non-cooperation",

402 U.S. at 481, 91 S.Ct. at 1567, whereby communications from the agency regarding status were returned in one case unanswered and, in another, unopened. *Ibid.* The December 10, 1986 letter is the antithesis of the "bypass [of the agency that] was deliberate and without excuse," 402 U.S. at 488, 91 S.Ct. at 1570, found by the Court in *McGee.*

its face and H.R.Rep. No. 764.[4] *Chandler v. Roudebush*, 425 U.S. 840, 861–62, 96 S.Ct. 1949, 1959–60, 48 L.Ed.2d 416 (1976); *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619 n. 17, 86 S.Ct. 1018, 1026 n. 17, 16 L.Ed.2d 131 (1966); *Newsom v. Vanderbilt University*, 653 F.2d 1100, 1108 (6th Cir.1981); *cf. Sierra Club v. United States Army Corps of Engineers*, 772 F.2d 1043, 1050 (2d Cir.1985).

### C. *Primary Jurisdiction*

█ Still, we do not demean the U.S. Trustee's desire, in effect, to exercise initial jurisdiction in order to maintain the bright line between administrative and judicial functions and in order to prevent evasion of U.S. Trustee input. These concerns, typical of those involving the allocation of dispute resolution between court and agency each having jurisdiction, *see, e.g., Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); R.J. Pierce, S.A. Shapiro & P.A. Verkuil, *Administrative Law & Process* 208–10 (1985), invoke the doctrine of primary jurisdiction.

Briefly, that doctrine enables deflection of "issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion," so that the facts may be "appraised by specialized competence" and "[u]niformity and consistency in the regulation of business entrusted to a particular agency [ma ' be] secured." *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). The applicability of the doctrine depends on the need to achieve those goals, *ibid.*, special expertise beyond that of judges, *Western Pacific*, 352 U.S. at 64–70, 77 S.Ct. at 165–68, and the availability of administrative procedures to consider the issue, *e.g., Amalgamated Meat Cutters & Butcher*

*Workmen v. Jewel Tea Co.*, 381 U.S. 676, 686–88, 85 S.Ct. 1596, 1600–01, 14 L.Ed.2d 640 (1965).

Here, the issue is one within the competence of bankruptcy judges and has been within their competence since October 1979 when the Bankruptcy Code became effective. The facts involved require no special expertise such as that required to understand and apply terms of art "particular to any industry." *See Western Pacific*, 352 U.S. at 66, 77 S.Ct. at 166. Moreover, the U.S. Trustee does not claim to have established administrative procedures. Nor does resolution of the issue require administrative discretion. U.S. trustees, on the basis of facts they find appropriate, may appoint additional committees as § 1102(a)(1) provides. But § 1102(a)(2) of the Code requires that there be adequate representation. That issue is not entrusted to the discretion of U.S. trustees although they may obviously consider it under § 1102(a)(1).

Thus, the question is like that presented in *Nader v. Allegheny Airlines, Inc*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). In that case, the Court examined the issue of whether a claim for common law fraud should be stayed in order for regulatory agency to consider the reasonableness of the challenged practice. In holding the doctrine of primary jurisdiction inapplicable, the Court, per Justice Powell, relied on the fact that, unlike tariff and rate cases, *see Note, Antitrust Jurisdiction and Remedies in an Electric Utility Price Squeeze*, 52 U.Chi.L.Rev. 1090, 1104–10 (1985), "the judgment of a technically expert body is not likely to be helpful" in deciding the case. 426 U.S. at 305–06, 96 S.Ct. at 1987. The same is true here.

Moreover, the concerns of the U.S. Trustee can be adequately satisfied by recognizing that U.S. trustees are necessary parties

---

**4.** This concept differs from that expressed in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414–15, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971), where it was stated that *de novo* review lies where the action is adjudicatory and the agency fact finding procedures are inadequate. That concept would also apply

here. The matter would lie under 5 U.S.C. § 554 and U.S. trustees have adopted no fact finding procedures. *See also Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.*, 381 U.S. 676, 684, 85 S.Ct. 1596, 14 L.Ed.2d 640.

to a motion under § 1102(a)(2) and have the opportunity to present fully their views. That is so because § 1102(a) expressly retains in the U.S. trustees the ability to appoint an additional committee ordered by the Court.[5] Thus, the form of order must be directed to that office. If there are administrative concerns that bear on the issue of adequate representation, the U.S. trustees can bring them to the Court's attention at the hearing in a manner consistent with the rules of evidence.

### III.

Accordingly, we now address the issue of adequate representation. At this stage, the principal issue before us is whether, as a matter of law, a separate committee is required to represent public debt in these circumstances.

In that regard, it is first to be observed that the statute's language asserts no express requirement of a separate committee to represent the holders of public debt of a holding company whose assets consist of stock in its subsidiaries, merely because the creditors of the subsidiaries may, in liquidation, have a superior claim to the real assets of the overall enterprises. But we do not read the words Congress employed "with the ease of a computer." *Kelly v. Robinson,* —— U.S. ——, 107 S.Ct. 353, 361, 93 L.Ed.2d 216 (1986) (quoting *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966)). The test of necessity to ensure adequate representation is necessarily vague. If representation is not adequate, it would appear that committee representation is necessary since Congress, in repealing § 1102(c), ended the court's ability to afford alternative relief through change of committee membership.

In addressing the issue, certain benchmarks have been and continue to be developed and assigned their appropriate weight. *See, e.g., In re Beker Industries*

*Corporation,* 55 B.R. 945, 13 B.C.D. 1230 (Bankr.S.D.N.Y.1985) (holders of publicly traded securities held to be entitled to representation). Highly important among these benchmarks is the presence of widely and publicly held debt securities. Generally, the holders of such debt are to be represented in a large Chapter 11 case where their interests may be affected by a plan of reorganization. *Beker,* 55 B.R. at 949; 5 L. King, *Collier on Bankruptcy* ¶ 1102.2, at 1102–18 (15th ed. 1987). Cost alone cannot, and should not, deprive public debt and security holders of representation. *Beker,* 55 B.R. at 951.

That point is analytically different from the question of whether the method of representation selected by the U.S. trustee is adequate. In analyzing that question, considerations such as the ability of the committee to function, the nature of the case, and the standing and desires of the various constituencies assume significance.

That significance, moreover, is to be measured not solely in relation to other factors but also in relation to the tasks that a committee or separate committee is to perform. *See In re Altair Airlines, Inc.,* 727 F.2d 88, 90 (3d Cir.1984). Section 1103(c)(2) includes within committee functions the possibility of investigation of the debtor, its business assets, liabilities and financial structure, and the desirability of the continuation of such business. But that description is not at all complete. Negotiation of a plan of reorganization is expected to take place among the debtor and the unsecured creditors committee and each additional committee, if any. *E.g., Altair,* 727 F.2d at 91. Each committee is also to be given notice of, and is expected to respond to, various requests. These include highly significant matters on which committee position is crucial, such as sales of property out of the ordinary course of business, *see Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063 (2d Cir.1983), post-pe-

---

5. Movants' argument that U.S. trustees have no standing to oppose a motion under § 1102(a)(2) is based on the premise that Congress did not include the U.S. trustees, in addition to parties in interest, in describing who could make a motion. The argument is thus completely inapposite. Description of the movants bears no relation to joinder of respondents.

tition financing agreements, *see Otte v. Manufacturers Hanover Commercial Credit Corp. (In re Texlon Corporation),* 596 F.2d 1092 (2d Cir.1979), and settlements, *see In re Lion Capital Group,* 49 B.R. 163, 12 C.B.C.2d 1031 (Bankr.S.D.N.Y. 1985).

■ In some of these tasks, the different types of debt and the different interests of creditors may lead to the conflict that Movants assert. But, contrary to Movants' assertion, the presence of potential conflict may not always require separate committees for representation to be adequate. *Salant,* 53 B.R. at 161; *In re Schaffer-Gordon Associates, Inc.,* 40 B.R. 956, 12 B.C.D. 322 (Bankr.E.D.Pa.1984); *In the Matter of Baldwin-United Corporation,* 45 B.R. 375 (Bankr.S.D.Ohio 1983); *In re The Charter Company,* 42 B.R. 251, 12 B.C.D. 322, 11 C.B.C.2d 385 (Bankr.M.D. Fla.1984); *In re Daig Corporation,* 17 B.R. 41, 43, 5 C.B.C.2d 232 (Bankr.D.Minn. 1981); *In the Matter of Schatz Federal Bearings Co., Inc.,* 5 B.R. 543, 548, 6 B.C.D. 692, 2 C.B.C.2d 741 (Bankr.S.D.N.Y. 1980); *cf. Altair,* 727 F.2d at 90. As those cases point out, creditors committees often contain creditors having a variety of viewpoints. Some members may favor liquidation; others may favor continuation of the business in order to preserve jobs or the viability of an important customer. Some debt may be contractually subordinated to other debt. Debentures, for example, are often subordinate to senior institutional indebtedness but not to trade debt. Maximization of return to debentureholders may lead to different views from those of senior indebtedness. "Such conflicts are not unusual in reorganization." *Altair,* 727 F.2d at 90. In most cases they can be expected among creditors acting to protect their separate business interests. In the usual case, they might not require a separate committee unless they impair the ability of the unsecured creditors committee to reach a consensus.

Thus, absent proof of the likelihood of that inability, the need for a separate committee is to be found, not by the *per se* rule asserted by Movants, but, *inter alia,* in the nature of the case and the composition of the committee. As to the first of these, cases involving a shaky business or untrustworthy management often give rise to members of the creditor constituency taking positions more extreme than those that might be otherwise taken, raise concerns for the ability of a single committee to function and reach a consensus, and point toward appointment of additional committees. *Beker* was a case so positioned. There the debtor had to fight for its survival through seeking to utilize cash collateral over objection, and the lenders were willing to provide financing for only a brief period, thus raising a concern that demands for additional financing would materially affect various creditor groups differently. In such instances the concept of adequate representation might well require different representation of those interests. *See Beker,* 55 B.R. at 949, 951.

Because each case is distinct, there is no hard and fast rule. As this Court observed in *In re Salant Corp.,* 53 B.R. 158, 161 (Bankr.S.D.N.Y.1985), "[t]he Code neither mandates nor precludes multiple creditors' committees in a Chapter 11 reorganization case. In each instance, the court is directed to determine whether an additional committee is required to assure adequate representation of creditors." *Beker* is not to the contrary. Although it is there stated that the complex nature of a large case "strongly indicates the need for additional committees representing different interests," 55 B.R. at 949, the issue in *Beker* was not whether a particular representation was adequate but whether public debt should be represented at all since no debentureholders were named to the unsecured creditors committee.

Here, the issue is different. There is no question that the debentureholders are entitled to representation. Indeed, they are currently represented on the Committee through the presence of one debentureholder and the indenture trustee, even were Prudential's holding of some $7 million of debentures to be discounted because it is

dwarfed by a large amount of other debt. That representation is to be increased if the U.S. Trustee honors the Committee's request to appoint another debentureholder to fill the seat vacated by the resignations.

■ As to whether that representation is adequate, the extant authorities offer little guidance. It would seem to require no citation, however, to reason that a committee in a case involving conflicts among creditors should not be dominated by one or more particular faction. That concern is tempered somewhat by the fundamental notion that a committee represents all unsecured creditors whether or not a member of a particular group is included in its membership. *Shaw & Levine v. Gulf & Western Industries, Inc. (In re Bohack Corporation)*, 607 F.2d 258, 262 n. 4 (2d Cir.1979). But it cannot be gainsaid that the presence of over-representation may likely call for the appointment of additional committees to represent those with whom that faction is in conflict. The test is not merely whether there is representation of a constituency, such as the holders of public debt, which ought to be represented. The statutory concern is *adequate* representation. In this regard, we decline to follow the holding in *In re White Motor Credit Corporation*, 18 B.R. 720, 3 C.B.C.2d 196 (Bankr.N.D.Ohio 1980), that a separate committee is required in each separate but jointly administered bankruptcy case. There is no indication that Congress gave any thought to jointly administered cases and intended to require a committee for each case. The cost could be extreme.

■ Nevertheless, the concern for adequate representation is heightened in situations such as this where the U.S. Trustee has appointed one committee for jointly administered cases. Selection of one committee for two or more jointly administered cases does give rise to the concern that the committee not be overloaded with the creditors of one debtor to the detriment of the representational needs of the creditors of another debtor, particularly where, as here, those creditors are holders of widespread public debt. These matters generally should be fleshed out at an evidentiary hearing. The overwhelming presence of U.S. Lines and U.S. Lines S.A. debt on the Committee, the lack of representation of First Colony debt except by Prudential's holding of debt of all four debtors and the seemingly small representation of public debt particularly demand attention. We cannot say, however, as a matter of law, that they require a separate committee *per se.*

## IV.

So too is an evidentiary hearing required regarding Movants' assertion that the membership of the indenture trustee on the Committee does not afford adequate representation. On this score, a reading of the indentures does reveal that the indenture trustee's powers are limited. Significant limitations were held in *Beker* to constitute sufficient rebuttal to the contention that an indenture trustee's powers obviated the need for any representation of debentureholders. Here, the question is not whether there is to be representation of public debt, but whether the presence of the indenture trustee on the Committee assists in affording adequate representation of the debentureholders. Indenture trustees often serve on such committees. Schroder, the indenture trustee here, neither supporting nor opposing the motion, asserts that it is not as powerless as Movants claim and that it can serve effectively on the Committee. Movants disagree. An evidentiary hearing is thus required.

An evidentiary hearing is also required with respect to the economic facts confronting these Debtors and these cases and with respect to the conflicts said to arise from the 1985 transfers from McLean to its subsidiaries and the charge that they were fraudulent under § 548 of the Code and state fraudulent transfer law, N.Y. Debt. & Cred. Law §§ 273–76 (McKinney 1945). The particulars of those transfers have not been presented to us. Indeed, no one seems to be able to describe them.

Committees should generally be formed at an early stage so that adequate repre-

sentation can be afforded before significant bridges are crossed. *In re Johns-Manville Corporation,* 801 F.2d 60, 62 (2d Cir.1986). Thus, this issue is to be resolved expeditiously and the hearing promptly scheduled. Accordingly, an evidentiary hearing shall be held on March 18, 1987 at 9:30 a.m.

IT IS SO ORDERED.